# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

GERALD E. VONTOBEL,

    Petitioner,

vs.

JAMES BENEDETTI, et al.,

    Respondents.

Case No. 3:10-cv-00073-LRH-VPC

**ORDER**

Before the court are respondents' motion to dismiss (#56) and petitioner's opposition (#60). The court finds that grounds 2, 3, and 6 have been procedurally defaulted. The court further finds that petitioner has not made the showing required for actual innocence to bypass the procedural default, and that petitioner has not shown cause and prejudice to excuse the procedural default of ground 2. The court grants respondents' motion.

After a jury trial in the Eighth Judicial District Court of the State of Nevada, petitioner was convicted of eleven counts of lewdness with a child under the age of 14, four counts of sexual assault upon a minor under the age of 14, one count of open or gross lewdness, two counts of attempted lewdness with a child under the age of 14, one count of lewdness with a child under the age of 14 with the use of a deadly weapon, three counts of child abuse and neglect, and three counts of second-degree kidnaping. Ex. 50 (amended judgment of conviction) (#26). Petitioner appealed, filing both an opening brief and a reply brief. Ex. 51, 53 (#26). The Nevada Supreme Court affirmed. Ex. 55 (#26).

///

Petitioner then filed a habeas corpus petition in the state district court. Ex. 60 (#26). The district court denied the petition. Ex. 63 (#26). Petitioner appealed, and the Nevada Supreme Court affirmed. Ex. 65 (#26).

Petitioner then commenced this action. The court appointed the Federal Public Defender to represent petitioner. Order (#3). The first amended petition (#23) followed.

Respondents then filed their first motion to dismiss (#30). The court agreed that petitioner had not exhausted his available state-court remedies for grounds 2, 3, and 6 of the first amended petition. Order (#42).

Petitioner asked to stay the action while he returned to state court. The court granted that request. Order (#48).

Petitioner then filed his second state habeas corpus petition. Ex. 88 (#52). The state district court held an evidentiary hearing on whether petitioner could demonstrate actual innocence to overcome the procedural bars of Nev. Rev. Stat. §§ 34.726(1) and 34.810 for untimeliness and successiveness, respectively. Ex. 98 (#52). The state district court determined that petitioner had not made the required showing. Ex. 114 (#52). Petitioner appealed. While on appeal, petitioner asked for a limited remand to consider new evidence: Petitioner had found the mother of the three children in this case and, with difficulty, obtained a declaration from her. Ex. 123 (#52). The Nevada Supreme Court denied that motion. Ex. 125 (#52). The Nevada Supreme Court later affirmed the state district court's denial of the petition. Ex. 126 (#52).

Petitioner then returned to this court, and respondents have filed their second motion to dismiss (#56).

A federal court will not review a claim for habeas corpus relief if the decision of the state court regarding that claim rested on a state-law ground that is independent of the federal question and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 730-31 (1991).

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Id. at 750; see also Murray v. Carrier, 477 U.S. 478, 485 (1986).  The grounds for dismissal upon which the Nevada Supreme Court relied in this case are adequate and independent state rules.  Vang v. Nevada, 329 F.3d 1069, 1074 (9th Cir. 2003) (Nev. Rev. Stat. § 34.810); Loveland v. Hatcher, 231 F.3d 640 (9th Cir. 2000) (Nev. Rev. Stat. § 34.726); Moran v. McDaniel, 80 F.3d 1261 (9th Cir. 1996) (same).

Petitioner argues first that he can demonstrate actual innocence to bypass the procedural default.  "A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."  House v. Bell, 547 U.S. 518, 538 (2006).

The evidence at trial showed that Shannon Schumacher had three children, J.H., N.S., and A.S., born in 1987, 1991, and 1995, respectively.  J.H. and N.S. are female, and A.S. is male.  Schumacher was, by most accounts, a very poor parent; she used drugs and was absent frequently.  Witnesses have disagreed on the exact dates, but at least in 1999-2000 petitioner lived with Schumacher and her children.  They lived in one apartment for a while, and then moved to another apartment.  The three children testified that during that time petitioner bound them, beat them, and sexually abused them.  On the other hand, petitioner testified that although he disciplined the children, he did not commit the crimes accused.  He also testified that he provided food for the children and that the children were affectionate to him.  He also testified that after he had moved out, he had joined Schumacher and her children for a day trip to the Las Vegas Strip, and that J.H. was happy and holding them both.

After petitioner moved out, Schumacher and her children moved from acquaintance to acquaintance.  Eventually, in March 2002, workers with child protective services found the children in a trailer that was abandoned, filthy, and without utilities.  Schumacher was not present.  The children were taken into custody.

The children went to different locations.  J.H. went to a group home in Las Vegas in or around October 2002.  In March 2003, she started disclosing to Pat Lehmann, the group home administrator, that petitioner had abused her physically and sexually.  Ex. 30, at 16 (#25).  N.S. and

A.S. went to the home of J.H.'s paternal grandparents, Mary and William Reusch, in Florida in July 2003.[1]  In or around October 2003, N.S. started disclosing to Mary Reusch that petitioner had abused her physically and sexually.  Ex. 25, at 38, 46 (#25).  William Reusch testified that A.S. started disclosing that petitioner had abused him physically and sexually around 6 months after A.S.'s arrival in Florida.  Id. at 72-75 (#25).  In one instance, William Reusch told A.S. that if he did not quiet down while they were in a movie theater, he would put duct tape over A.S.'s mouth.  A.S. became enraged, saying that nobody would ever put duct tape upon him again.  Id. at 72.

In February 2004, Schumacher traveled to Florida at her own expense to try to visit N.S. and A.S.  She was not allowed to see them.  In March 2004, Michelle Molina-Price became the caseworker for J.H.  That same month, she received a report from J.H.'s school that J.H. had disclosed physical and sexual abuse.  Molina-Price reported this information to the Las Vegas Metropolitan Police Department.  Detective John Baltas interviewed J.H.  His testimony at trial as to what J.H. told him about N.S. and A.S. is unclear.  At one point, he testified that J.H. told him that petitioner had physically and sexually abused N.S. and A.S.  Later, he testified that J.H. told him that petitioner had sexually abused only her.  Regardless of his testimony at trial, he arranged for James Meissner of the Pasco County, Florida child protective services to interview N.S. and A.S.  By the time that Meissner interviewed those children, in mid-2004, J.H. had traveled to Florida.  She did not participate in the interviews of N.S. and A.S., but she spoke with Meissner after he interviewed the other two children.  These interviews led to petitioner being charged.

The trial took place in March 2005.  Shannon Schumacher did not testify at the trial.  Nobody could find her, even though the state simultaneously was trying to terminate her parental rights over N.S. and A.S. in family court.

The new evidence in this case are the declarations and testimonies of six witnesses who did not testify at trial, plus a declaration from Shannon Schumacher, the mother of the then-minor victims.  The six witnesses testified at the evidentiary hearing in state district court on petitioner's second state habeas corpus petition.  Five of them, who were adults at the relevant time, testified

---

[1] Each child of Schumacher has a different father.

that they never saw the children act afraid around petitioner, and that they treated him with affection. They also testified that petitioner would take care of the children, taking them to the store, buying food for them, and cooking for them. The sixth witness, who was a girl of J.H.'s age, testified that she and J.H. were fast friends, that they shared intimate information, and that J.H. never disclosed sexual abuse to her.[2]

Petitioner finally located Shannon Schumacher while the appeal from the denial of the second state habeas corpus petition was pending. Schumacher declares that she would have known if petitioner had abused the children, that the children would have told her about any abuse, and that if she had known how serious the allegations against petitioner were, she would have appeared at his trial to testify. Ex. 128 (#59).

This new evidence does not directly contradict the testimony of the children. The witnesses at the evidentiary hearing and Schumacher all state that they never saw petitioner abuse the children, but the children all testified that petitioner abused them when he was alone with them. The new evidence also is not much different from petitioner's own testimony, as described above. The difference is that these people were not the defendant, whom the jury might have believed was giving self-serving testimony.

Petitioner uses this new evidence to try to undercut the credibility of the children. Their testimonies had inconsistencies. Furthermore, the defense theory at trial, and the theory in the first amended petition, was that J.H. created these allegations to prevent Schumacher from reuniting with her and the other children. Petitioner argues that if the jury had considered what was effectively the same evidence as petitioner's testimony from these new witnesses, then any reasonable juror would have had reasonable doubt and found petitioner not guilty.

The court disagrees. Each child independently disclosed physical and sexual abuse to different people: J.H. to Pat Lehmann, N.S. to Mary Reusch, and A.S. to William Reusch. Furthermore, A.S.'s reaction to a threat of being gagged was, in William Reusch's word, berserk.

---

[2] J.H. testified at trial that she had told this friend about sexual abuse at the hands of another person, and that the friend did not believe her.

-5-

Petitioner's new evidence does not attack the credibility of these witnesses.  Lehmann and the Reuschs did not know who petitioner was before the disclosures of the children, because petitioner had been out of the lives of the children for more than a year before the disclosures started.  There was no evidence, either at trial or in the evidentiary hearing for the state habeas corpus petition, that these people coordinated what they said that the children told them.

At trial, Michelle Molina-Price, the Nevada child protective services caseworker for the children, explained at trial what was happening over at family court.  The state was seeking the termination of parental rights over N.S. and A.S., aged 13 and 9 at the time of the trial.  The purpose of the termination proceedings was to free N.S. and A.S. for adoption.  The state was not seeking termination of parental rights over J.H., aged 17 at the time of the trial, because J.H. did not need to be freed for adoption.  J.H. was going into an independent living program, where she was living in an apartment with a friend and receiving a stipend from the state.  Reunification with Schumacher never was part of the plan for J.H.  Ex. 28, at 80-81 (#25).

Meanwhile, as described above, Schumacher tried to re-establish contact with N.S. and A.S., traveling to Florida at her own expense in February 2004.  Schumacher had been in contact with J.H., at least telephonically, since the children were taken into state custody.  Molina-Price testified that Schumacher was informed about the steps that she needed to take to avoid termination of parental rights and to obtain reunification.  Molina-Price also testified that Schumacher's performance was intermittent at best, and she was not appearing at family-court hearings.  Ex. 28, at 56-68 (#25).

In sum, reunification was not a likely possibility, either for J.H. or for N.S. and A.S.  J.H. was going into an independent living program, and Schumacher was not taking the steps needed to reunify with N.S. and A.S.

Despite all that information, perhaps J.H. believed otherwise, even if Molina-Price explained the situation to her.  J.H. was aged 16 when Schumacher tried to re-establish contact with N.S. and A.S., and she would not have possessed the experience and understanding of the family-court processes that a caseworker or an attorney would have possessed.  Furthermore, the evidence at trial showed that J.H. thought of herself as a mother or protector of the two younger children.  Perhaps,

even if J.H. knew that she would not be reunified with Schumacher, she wanted to fabricate a reason to keep Schumacher from reunifying with N.S. and A.S.

Three problems exist with this argument. The problems actually existed before the new evidence that petitioner presents now, and that new evidence does not in any way affect the problems. In effect, the new evidence does not mean that no reasonable juror would not find petitioner guilty beyond a reasonable doubt.

First, why would the children lie about being sexually abused by petitioner? He was out of their lives for several years. In effect, petitioner is arguing that the children were trying to avoid reunification with Schumacher by claiming that she was a poor parent for allowing petitioner to abuse them. That is not an ironclad reason for denying reunification. After that many years, Schumacher still could have worked hard to demonstrate to the family court that she had changed and could now be a good mother. If the children were going to lie about sexual abuse to avoid reunification with Schumacher, then they might as well have told the one lie that would have stopped reunification cold: That Schumacher had sexually abused them.

Second, the dates do not work for petitioner's argument as he has presented it in the first amended petition. The first mention in the first amended petition (#23) of Schumacher's desire for reunification comes in February 2004, when Schumacher traveled to Florida to try to see N.S. and A.S.; petitioner notes that Molina-Price kept her juvenile clients informed of developments in their cases, and that Molina-Price did tell J.H. about Schumacher's efforts for reunification. First amended petition, at 10 (#23). Then, on February 24, 2004, "Shannon Schumacher informs Michelle Molina-Price in a phone call that she fully intended to challenge the termination of her custody of the children. Schumacher, here-to-for a totally disinterested mother is making considerable efforts to maintain custody and most certainly alarming [J.H.] who would recognize this as an effort by her mother to maintain control." Id. at 11 (#23). However, in March 2003, J.H. disclosed to Pat Lehmann that petitioner had abused her. Then, in October 2003, N.S. disclosed to Mary Reusch that petitioner had abused her. Around the end of 2003, A.S. disclosed to William Reusch that petitioner had abused him. The children could not have falsely accused petitioner of

1  abusing them to avoid reunification with Schumacher, because at the time of the disclosures they
2  did not know that Schumacher was seeking reunification.
3        Third, the new evidence would not change a reasonable juror's determination if the court
4  considered the new evidence in conjunction with the defense that petitioner's trial counsel actually
5  presented. As the trial proceeded, trial counsel recognized the dates of disclosure of abuse had
6  created a problem for the defense.[3] Trial counsel tried to salvage the defense with an argument that
7  the children had conspired to accuse petitioner of molesting them. Trial counsel had two beneficial
8  pieces of evidence. First, petitioner testified that he was in contact with Schumacher in March
9  2003, that Schumacher told him that she wanted to reunify with the children, and that he offered to
10 help her financially. Ex. 30, at 116-17 (#25). Second, around the same time Schumacher was in
11 frequent contact with J.H., and J.H. was in frequent contact with N.S. and A.S. Trial counsel had no
12 evidence that Schumacher told J.H. in March 2003 that she wanted to reunify and that petitioner had
13 offered to help financially. Trial counsel also had no evidence that the children did indeed conspire
14 to falsely accuse petitioner of molesting them. However, trial counsel did argue that the jury could
15 infer that Schumacher must have informed J.H. about her desire because the two were in frequent
16 contact. Trial counsel also argued that the jury could imply from that inferred conversation that
17 J.H., fearing reunification and loss of control, conspired with her children to make those false
18 accusations. Ex. 31, at 71 (#25).
19       The new evidence, in conjunction with the defense presented at trial, does not make it more
20 likely than not that any reasonable juror would have reasonable doubt. The jury would have to
21 believe that, immediately upon hearing from Schumacher in March 2003 that she wanted to reunify
22 with the children and that petitioner would help, J.H. made up the story of abuse and told Pat
23 Lehmann. The jury also would have to believe either that J.H. either told the other children while

---

[3] If trial counsel did not fully recognize the problem with the dates at first, then they knew by day 6 of the trial. In a hearing on whether upcoming witnesses' testimonies would be hearsay or prior consistent statements, the prosecutor noted the apparent defense, which was consistent with petitioner's arguments in the first amended petition. Ex. 28, at 30 (#25). The prosecutor also noted that the defense counsels' "dates aren't actually panning out the way they were thought to be initially." Id. at 31.

-8-

they were in Vegas to tell lies half a year later, in October 2003, or that J.H. told the children over the telephone phone in October 2003 to tell lies about petitioner's sexual abuse. The latter would require nobody on either end of the connection to have overheard the conspiring. Then the actual jury in 2005 would have to believe that all three children kept this conspiracy completely secret for about two years. This conspiracy would require long-term planning and patient execution. However, the trial transcript shows that N.S. and A.S. barely were able to control themselves for the short times that they testified; no reasonable juror would have believed that the children could have kept a secret like this for very long without letting it out. Additionally, now the court is looking at the case a decade after trial. In all that time, not one of the children has admitted to this conspiracy or told somebody else who then has informed petitioner, petitioner's counsel, the prosecution, the state courts, or this court. No rational juror would believe that a conspiracy among these particular three children could have been held secret for that long. Instead, any rational juror would have come to the more simple conclusion: For all their inconsistencies, the children did not lie about petitioner's abuse. The new evidence would not change this conclusion.

Petitioner also argues that he can demonstrate good cause and prejudice to overcome the procedural default of ground 2 because he was not appointed counsel in his first state habeas corpus petition. Ground 2 is a claim that counsel provided ineffective assistance because counsel did not investigate and call to testify the six witnesses who could have testified about petitioner's good relationship with the children.[4]

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. <u>The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial.</u> The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. Cf. <u>Miller–El v. Cockrell</u>, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue).

---

[4] Ground 2 does not mention Shannon Schumacher. The investigator for the federal public defender found Schumacher two and a half years after the first amended petition was filed. See Ex. 129 (#59).

Martinez v. Ryan, 132 S. Ct. 1309, 1318-19 (2012) (emphasis added).[5] Nevada law requires ineffective-assistance claims to be brought in a post-conviction habeas corpus petition, with possible exceptions that are not relevant to this case. A petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

      In coming to its conclusion about petitioner's actual-innocence argument, this court has reviewed the transcript of the trial, the transcript of the evidentiary hearing, the declarations of the witnesses who testified at the evidentiary hearing, Schumacher's declaration, and the other exhibits filed in support of the first amended petition. After all that, this court concludes that the claim of ineffective assistance in ground 2 is not substantial because petitioner cannot demonstrate prejudice. Petitioner alleges in the first amended petition (#23) that he testified because counsel did not investigate and call these witnesses. However, petitioner himself testified that Schumacher told him in or around March 2003 that she wanted to reunify with her children. Petitioner also testified that he offered financial help to Schumacher for her efforts. That testimony let trial counsel argue that the children had reason to lie that petitioner had sexually abused them. If, as petitioner wishes now, these witnesses had testified and petitioner had not testified, the jury would have been presented with evidence that the children outwardly showed affection to petitioner, but the rest of the evidence would have shown that they had accused him of abuse before they had any reason to lie. The jury still would have found petitioner guilty. The ineffective-assistance claim in ground 2 is insubstantial, and the court will dismiss it as procedurally defaulted.

      Petitioner presents no other arguments for cause and prejudice to excuse the procedural defaults of grounds 2, 3, and 6.

---

[5] Grounds 3 and 6 are not claims of ineffective assistance of counsel, and Martinez does not apply to them.

IT IS THEREFORE ORDERED that respondents' motion to dismiss (#56) is **GRANTED**. Grounds 2, 3, and 6 of the first amended petition (#23) are **DISMISSED** with prejudice because they are procedurally defaulted.

IT IS FURTHER ORDERED that respondents shall have forty-five (45) days from the date of entry of this order to file and serve an answer to the remaining grounds of the first amended petition (#23). The answer must comply with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts. Petitioner will have forty-five (45) days from the date on which the answer is served to file a reply.

DATED this 9th day of March, 2016.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE