1
2
3
4
5 **UNITED STATES DISTRICT COURT**
6 **DISTRICT OF NEVADA**
7
GERALD VON TOBEL,
8
        *Petitioner*,                                    3:10-cv-00073-LRH-VPC
9 vs.
                                                          ORDER
10 JAMES BENEDETTI, *et al.*,
11         *Respondents*.

12

13        This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on the merits

14 of the remaining grounds.

15                                    ***Background***

16        Petitioner Gerald Von Tobel challenges his 2005 Nevada state conviction, pursuant to a jury

17 verdict, of eleven counts of lewdness with a child under the age of fourteen, four counts of sexual

18 assault with a minor under the age of fourteen, one count of open or gross lewdness, two counts of

19 attempted lewdness with a child under the age of fourteen, one count of lewdness with a child under

20 the age of fourteen with the use of a deadly weapon, three counts of child abuse and neglect, and three

21 counts of second-degree kidnapping.  He challenged the judgment of conviction, as amended, on direct

22 appeal and two rounds of state post-conviction review.

23                                  ***Standard of Review***

24        The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential"

25 standard for review of state-court rulings on the merits that is "difficult to meet" and "which demands

26 that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

27 Under this highly deferential standard of review, a federal court may not grant habeas relief merely

28 because it might conclude that the state court decision was incorrect.  563 U.S. at 202.  Instead, under

28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 563 U.S. at 181-88.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate

panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 569.

### *Discussion*

#### *Ground 1: Juror Misconduct*

In Ground 1, Von Tobel alleges that he was denied rights to confrontation and to trial by an impartial jury in violation of the Sixth and Fourteenth Amendments when a juror engaged in a conversation with a neighbor who was a police officer, who opined that a defendant "wouldn't be here [at trial] if he didn't do something," allegedly negating petitioner's right to the presumption of innocence.[1]

The jury began its deliberations from prior to 4:00 p.m. to approximately 6:00 p.m. on Thursday, March 17, 2005, before returning at 10:00 a.m. the next day.[2]

During the day on that Friday, the jury sent a note asking: "If we don't agree on all counts can we convict only on what we agree." The court responded that the answer to the question was contained within the instructions. Prior to 4:45 p.m., the jury sent another note reflecting that they could not agree on nineteen specified counts, that they did agree on seven other specified counts, and that there were two jurors for whom no further amount of deliberation would change their vote. The jurors asked how they were to proceed and, if the answer was in the instructions, on what page. The court again referred generally to the instructions and discharged the jury until Monday morning to resume deliberations.[3]

/ / / /

---

[1]ECF No. 23, at 13-16.

[2]See ECF No. 25-11, at 2 & 109-11; Exhibit 31, at 1 & 106-08.

[3]ECF No. 25-13, at 6-9; Exhibit 33. ECF No. 25-14; Exhibit 34.

During the day on Monday, March 21, 2005, the jury sent a longer note reflecting that the jurors were "going nowhere," that they agreed on sixteen unspecified counts, that they could not agree on the others, and that the jurors did not "feel we can come together unanimously on all counts." The note stated that the jurors understood the rules on a unanimous verdict, but they sought an explanation as to a "hung jury" if that was an option. The court requested that the jury continue to deliberate, stating that if they had not reached a verdict by the end of the day, they would be called back at 9:00 a.m. the next morning for continued deliberation.[4]

At approximately 9:00 a.m. on the Tuesday morning, the jury returned a verdict, finding Von Tobel guilty on twenty-five counts and not guilty on one count.[5]

Before releasing the jury, the trial judge encouraged the jurors to voluntarily "stay and chat" with counsel as to "why or how you reached your decision."[6]

Defense counsel's declaration submitted with a motion for new trial filed the next day asserted, *inter alia*, the following regarding what transpired thereafter:

> That after the reading of the verdict your declarant remained in the courtroom to speak with the jurors, along with co-counsel, Amy Coffee, and Deputy District Attorney Mary Kay Holthus. That during this informal discussion with the jurors, Juror No. 200, Jimmie Petersen, was asked what factors in the case had an impact on his verdict. Petersen then remarked, "It's like my neighbor, who is a cop, always says, 'He wouldn't be here if he didn't do something.'"

(ECF No. 25-18, at 3; Exhibit 38, at 2, ¶ 7.)

The state district court held an evidentiary hearing on April 12, 2005. Jimmie Petersen testified, *inter alia*, that his neighbor "Joe" previously had told him that he was "an undercover cop" with the Boulder City, Nevada police department.[7] During examination by the court, Petersen testified to the following exchange with the neighbor occurring during the trial:

---

[4]ECF No. 25-13, at 10-11; Exhibit 33.

[5]ECF Nos. 25-15 & 25-17; Exhibits 35 & 37.

[6]ECF No. 25-15, at 6-8; Exhibit 35, at 5-7.

[7]ECF No. 26-5, at 19-20; Exhibit 45, at 18-19. No other evidence was presented that "Joe" in fact was a police officer.

Q     Was there any time during the voir dire, or the course of this case when in fact you had a conversation with this next door neighbor of yours wherein you discussed this case?

A     I did not discuss the case with him.

Q     What, if any conversation did you have about this case with your next door neighbor?

A     I went out to the community mailbox and I happened to meet him out there one day, and –

Q     During the trial?

A     During the trial; and I said: You know, I don't know how you put up with this stuff that you have to do with.

Q     Okay.

A     I said – he said: Oh. It's just want [sic] you have to do. And I said – I just mentioned that I was on jury duty and I was having a tough time. I says: I've got stuff that's going on here that just makes me sick. Matter of fact, I have a hard time sleepin' with it as a result of it.

      And essentially that was pretty much the conversation. I did not disclose anything at all about the case, what it was, what it was about. He made the comment – I don't know whether it was then or at a later time that he says: Well, a lot of cases never get that far. They get plead out before it ever happens; and he says, for example, he says: We have one in Boulder City that there's – it was a kid got killed in gang something or other, I don't recall the whole – all of the things about it; and he says: There's already people that have plead out serving time while the others are waiting to go to Court. And that was pretty much the conversation.

Q     Did he make a comment to you about if someone appears in a court of law that they must have done something?

A     Not really.

Q     You don't deny in fact though that you made a statement sort of like that when we were here after the return of the verdict?

A     No, I don't deny that.

(ECF No. 26-5, at 16-18; Exhibit 45, at 15-17.)

Petersen further testified in response to the court's examination that: (1) the conversation did not affect in any way his understanding of the presumption of innocence; (2) the conversation did not affect his ability to keep an open mind about the case as he listened to the evidence; (3) he did not decide after talking to the officer that Von Tobel must have done something or else he would not be in

court; (4) the officer was "just a neighbor" with whom he did not otherwise socialize; (5) he did not withhold any information during voir dire regarding his understanding of the presumption of innocence; (6) he did not make up his mind as to guilt or innocence prior to deliberations; and (7) he actually changed his mind several times during deliberations.[8]

Toward the end of an extensive examination of the juror by defense counsel, the following exchange occurred:

> Q    Okay. Sir, at that point when you were speaking with the police officer, the police officer talked to you about a case that he was involved in in Boulder City, correct?
>
> A    Yes.
>
> Q    He told you that he had a case where a kid had been killed?
>
> A    Yes.
>
> Q    Okay, and it was at that point that the police officer offered his opinion that if someone is there – meaning if someone is on trial – that they are there for a reason?
>
> A    I don't know if it was his opinion. I'd say it was more of statement.
>
> Q    Okay, and he told you that statement at that point?
>
> A    I believe so, yes.
>
> Q    During the trial?
>
> A    I believe it –

(ECF No. 26-5, at 29-30; Exhibit 45, at 28-29.)

Petersen further testified in response to counsel's examination that: (1) he respected the work that his neighbor did as a police officer; (2) he "took [the statement] to mean that was his opinion;" (3) the statement meant "[n]ot a thing" to him; (4) the statement did not affect him one way or the other in the case; (5) it did not influence his thought process, how he viewed the evidence, or his verdict.[9]

////

---

[8]ECF No. 26-5, at 16 & 17-18; Exhibit 45, at 15 & 16-17.

[9]ECF No. 26-5, at 30-31; Exhibit 45, at 29-30.

Defense counsel further elicited the following testimony from Petersen about his post-verdict comment, after establishing that multiple trial participants including counsel and the judge were present:

> Q    . . . and one of the comments that you made during that discussion right after the verdict was that it reminded you of what [your] neighbor had said?
>
> A    Yes, I did.
>
> Q    You said that the verdict reminded you that the police officer had felt if someone is on trial, they're there for a reason?
>
> A    I believe so.
>
> Q    And that was immediately after the verdict?
>
> A    I believe so.

(ECF No. 26-5, at 31-32; Exhibit 45, at 30-31.)[10]

At the conclusion of the evidentiary hearing, the trial judge initially noted that she was present when the juror made the comment following the verdict to the effect that the officer had said "[i]f they're here, they're here for a reason." She stated that "I heard, I saw, and I was present for all of that which gives rise to the matter before me now."[11]

The judge noted that the juror perhaps had violated her standard admonition to jurors to not discuss the case when he said to the officer that he did not know how they did what they did. She further concluded as follows:

> I find, however, that the true violation of this order occurred when he either in response, or in the typical neighborhood banter, said: I'm involved in a case that because of what I'm hearing, it's making me sick. That's discussing a subject that is related to or connected to the trial. That's all that he discussed.
>
> Then my analysis needs to be whether or not as a result of that impermissible discussion, was he influenced by the discussion? Was he subsequently unable to maintain the oath that he had taken to keep an open mind, to be fair to both sides in this case? I found from his

---

[10]Von Tobel asserts that Petersen "could not sleep" the night before the hearing, to suggest that he was "clearly concerned" about testifying. (ECF No. 69, at 8 & 16 n.1.) The hearing was held three days before the April 15, 2005, tax deadline; and Petersen worked as a tax preparer for H&R Block. He stated that he *did not* sleep the night before, not that he *could* not. (ECF No. 24-20, at 93; Exhibit 19, at 92. ECF No. 26-5, at 7, 26 & 28; Exhibit 45, at 6, 25 & 27.)

[11]ECF No. 26-5, at 40-41; Exhibit 45, at 39-40.

-7-

testimony that he never swayed in his belief that he was obligated to listen to the facts and the evidence in this case, and render a verdict only after he listened to all of the witnesses, saw all of the evidence, and began deliberations with his fellow jurors.

He never wavered with respect to the presumption of innocence. He did not have a preconceived idea about the guilt or innocence of this case. His discussion with the neighbor did not affect his belief or reliance upon the presumption of innocence, and although I stopped short, or tried to stop short in my questioning as to whether or not he had made up his mind about the guilt or innocence of this defendant before he began deliberations, he responded that he had not, and then he gave me more information than I think we were entitled to when he said: Well, actually I changed my mind several times during the deliberative process.

So while I find that this juror went – had a conversation with a neighbor that discussed his apparent physical reaction to a case that he was a juror on, I find no evidence that the nature of the case was discussed; that the conversation itself had any influence on the determination of guilt or innocence in this case; that the respect for the presumption of innocence remained un-violated – inviolate I believe is the correct word for that – until such time as this juror deliberated with the other jurors, weighed and balanced presumably the evidence, applied the law as given in the instructions, and that there is no error that would require the granting of the motion for a new trial; and that will be this Court's order.

(ECF No. 26-5, at 43-44; Exhibit 45, at 42-43.)

The Supreme Court of Nevada held as follows in its February 29, 2008, order of affirmance:

<u>Juror misconduct</u>

Von Tobel argues that the district court should have granted his motion for a mistrial on the ground that a juror engaged in a conversation concerning the case with his neighbor, an off-duty police officer. This court generally reviews a district court's denial of a motion for a mistrial because of juror misconduct for an abuse of discretion.[FN1] When the allegation of juror misconduct involves exposure to extrinsic evidence or influence in violation of the Confrontation Clause, we review de novo the district court's determination regarding the prejudicial effect of the misconduct.[FN2] We will not disturb the district court's factual findings absent clear error.[FN3]

[FN1] <u>Lane v. State</u>, 110 Nev. 1156, 1163, 881 P.2d 1358, 1363-64 (1994), <u>vacated on other grounds on rehearing</u>, 114 Nev. 299, 956 P.2d 88 (1998).

[FN2] <u>Meyer v. State</u>, 119 Nev. 554, 561-62, 80 P.3d 447, 453 (2003).

[FN3] <u>Id.</u>

Von Tobel argues that the neighbor's comments to the juror constituted extrinsic evidence and thus implicated the Confrontation Clause, which would invoke this court's de novo review. In response, the State asserts that the misconduct does not implicate the Confrontation Clause because the juror did not learn anything new from the neighbor's statements and the conversation did not concern the nature of the case.

The juror was not exposed to any outside information specific to this case; however, he was exposed to the neighbor's outside opinion that anyone on trial as a criminal defendant must have done something wrong. If another juror had expressed this opinion during deliberations, then it would not have been extrinsic evidence because it would have been an exchange of ideas and opinions among the jury. Because the opinion came from a source outside of the trial or the jury, it was extrinsic; therefore, we apply a de novo standard of review.

A defendant who moves for a new trial based on allegations of juror misconduct bears the burden of proof to show that misconduct occurred and that the misconduct prejudiced the defendant.[FN4] To show prejudice, the 'defendant must prove that "there is a reasonable probability or likelihood that the juror misconduct affected the verdict."[FN5] "[I]n the most egregious cases of extraneous influence on a juror, such as jury tampering," this court applies "a conclusive presumption of prejudice."[FN6] However, this court has expressly rejected the proposition that any extrinsic influence requires an automatic presumption of prejudice.[FN7]

[FN4] Id. at 563-64, 80 P.3d at 455.

[FN5] Id. at 564, 80 P.3d at 455.

[FN6] Id.

[FN7] Id.

We first determine that it was misconduct for the juror to discuss with his neighbor the fact that he was on a jury for a criminal trial and that the facts of the case were sickening. However, because the conversation with his neighbor, who happened to be a police officer, did not concern the particular facts of this case, the misconduct was not egregious. Therefore, we conclude that a presumption of prejudice does not apply.

When prejudice is not presumed, a defendant must prove prejudice, with admissible evidence. Reviewing the trial as a whole, a defendant must show that there was a reasonable probability that the juror misconduct affected the verdict.[FN8] To determine if the misconduct by accessing extrinsic materials affected the verdict, courts may consider how the extrinsic material was introduced to the jury, when it was introduced, how long the jury discussed it, whether the information was vague or specific, whether it was cumulative of other evidence, whether it was material, and its weight.[FN9] A district court's factual investigation is limited to determining which jurors were exposed and the scope of exposure. Then the court must apply an objective test as to whether such exposure would affect a reasonable juror and may not

-9-

inquire into the actual effects the extrinsic evidence had on deliberations. [FN10]

[FN8] Id. at 565, 80 P.3d at 456.

[FN9] Id. at 566, 80 P.3d at 456.

[FN10] Id. Von Tobel also argues that the district court improperly considered how the conversation affected the juror subjectively. Because we review the district court's determination of prejudice de novo, and we apply the appropriate objective standard, we do not address this contention.

Von Tobel has failed to show a reasonable probability that the misconduct affected the verdict. Although the juror's neighbor expressed an opinion regarding the justice system and the juror admitted that he respected his neighbor and the work he did, the conversation did not involve any details of this case. And, while the conversation took place during the trial, the district court instructed the jury regarding the law after the conversation occurred. The court instructed the jury on the presumption of innocence and the jury is presumed to have adhered to that instruction.[FN11] Although a reasonable juror may have been affected by hearing an opinion regarding the presumption of innocence from a neighbor he or she respected, a district court's instruction could cure any possible prejudice. Therefore, we conclude that Von Tobel has failed to show that exposure to his or her neighbor's opinion would have affected a reasonable juror in such a way as to demonstrate a reasonable probability that the exposure affected the jury's verdict.

[FN11] Lisle v. State, 113 Nev. 540, 558, 937 P.2d 473, 484 (1997).

(ECF No. 26-15, at 2-6; Exhibit 55, at 1-5.)

On federal habeas review, Von Tobel contends that the state supreme court's application of the analysis outlined in its earlier *Meyer* decision to this case was contrary to clearly established federal law. Petitioner relies upon, *inter alia*, holdings by the Ninth Circuit in to an extent related cases as to what constitutes clearly established federal law as determined by the United States Supreme Court.

In its recent decision in *Godoy v. Spearman*, 861 F.3d 956 (9th Cir. 2017), the Court of Appeals, sitting *en banc*, stated:

The state appellate court's decision was contrary to the clearly established Supreme Court law that the parties agree governs this case. The Court emphasized long ago that due process does not tolerate "any ground of suspicion that the administration of justice has been interfered with" by external influence. *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892), *called into doubt on other grounds by Warger v. Shauers*, —— U.S. ——, 135 S.Ct. 521, 526–27, 190 L.Ed.2d

-10-

422 (2014). Thus, when faced with allegations of improper contact between a juror and an outside party, courts apply a settled two-step framework. At step one, the court asks whether the contact was "possibly prejudicial," meaning it had a "tendency" to be "injurious to the defendant." *Id.* at 150, 13 S.Ct. 50. If so, the contact is "deemed presumptively prejudicial" and the court proceeds to step two, where the "burden rests heavily upon the [state] to establish" the contact was, in fact, "harmless." *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). If the state does not show harmlessness, the court must grant the defendant a new trial. *See Remmer v. United States*, 350 U.S. 377, 382, 76 S.Ct. 425, 100 L.Ed. 435 (1956) (*Remmer II*). When the presumption arises but the prejudicial effect of the contact is unclear from the existing record, the trial court must hold a "hearing" to "determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial." *Remmer*, 347 U.S. at 229–30, 74 S.Ct. 450.

861 F.3d at 956.

In *Godoy*, the Ninth Circuit necessarily was addressing clearly established law as of the time of the state appellate court's March 18, 2009, decision in that case,[12] based upon the 1892 *Mattox* decision and the mid-1950's *Remmer* decisions from the United States Supreme Court. *Godoy* thus would appear to speak to the state of Supreme Court law also only a year earlier at the time of the February 29, 2008, decision on direct appeal in Von Tobel's case. Such circuit precedent can establish within the circuit what in turn was clearly established federal law as determined by the Supreme Court at a relevant time. *See, e.g., Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

Petitioner contends that the state supreme court's application of the framework outlined in its previous *Meyer* decision was contrary to the clearly established federal law outlined in *Godoy* because the state court did not apply the correct standard for assigning the burden and failed to place the burden on the State to overcome a presumption of prejudice arising from the juror's misconduct.[13]

While the issue is a debatable one, the Court is not persuaded that petitioner has shown that Ninth Circuit precedent establishes that the rule applied by the Supreme Court of Nevada, in this particular context, was contrary to clearly established federal law as determined by the United States Supreme Court at the time of the state supreme court's February 29, 2008, decision on the merits.

---

[12] *See People v. Godoy*, 2009 WL 692698 (Cal. Ct. App., March 18, 2009).

[13] See, e.g., ECF No. 70-1 (notice of supplemental authorities). The Court is granting petitioner leave by this order to file his notice of supplemental authorities and argument to his reply pursuant to Local Rule LR 7-2(g). Given that the reply is the last pleading filed, a further filing by respondents is not necessarily required in this situation.

The same *Godoy en banc* opinion emphasizes later in the opinion that not every external contact, even by law enforcement, leads to a presumption of prejudice under *Mattox* and *Remmer*:

> We recognize the practical impossibility of shielding jurors from all contact with the outside world, and also that not all such contacts risk influencing the verdict. *See Tarango*, 837 F.3d at 947 (citing *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). Thus, the defendant's burden at step one cannot be met by "[t]hreadbare or speculative allegations" of misconduct. *Id.* Nor do "allegations involving prosaic kinds of jury misconduct," *id.* (internal quotation marks omitted), such as "chance contacts between witnesses and jury members—while passing in the hall or crowded together in an elevator," *id.* at 951, trigger the presumption. **The defendant must present evidence of a contact sufficiently improper as to raise a credible risk of affecting the outcome of the case.**
>
> Among the considerations relevant to this determination are the identity of the outside party and the nature of the contact. We have held, for example, that "undue contact" between jurors and certain government officers—like bailiffs or law enforcement agents—will "**almost** categorically" trigger the presumption. *Id.* at 947. **This may be especially true when the officer is "deeply entangled in [the] case."** *Id.* at 949 (applying the presumption where police officers who were victims, investigators and witnesses in the case tailed a holdout juror on his drive to the courthouse); *see also Parker v. Gladden*, 385 U.S. 363, 365, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam) ("[T]he official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a [sequestered] jury which he had been shepherding for eight days and nights."); *Remmer*, 347 U.S. at 229, 74 S.Ct. 450 ("The sending of an F.B.I. agent in the midst of a trial to investigate a juror ... is bound to impress the juror and is very apt to do so unduly. A juror must feel free to exercise his functions without the F.B.I.... looking over his shoulder."); *Mattox*, 146 U.S. at 151, 13 S.Ct. 50 ("Nor can it be legitimately contended that the misconduct of the bailiff could have been otherwise than prejudicial. Information that this was the third person Clyde Mattox had killed, coming from the officer in charge, precludes any other conclusion."). Similarly—regardless of the outside party's identity—communications "about the matter pending before the jury," "if not made in pursuance of [the] rules ... and the instructions ... of the court," greatly increase the risk of prejudice. *Remmer*, 347 U.S. at 229, 74 S.Ct. 450; *see also Caliendo*, 365 F.3d at 697–98 ("**Other factors may include the length ... of the contact, ... evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction.**").
>
> **We bear in mind that even such highly troubling contacts do not *necessarily* raise a presumption of prejudice.** At step one, the court considers the full context of the contact to determine whether a credible risk of prejudice exists. Contact with a government officer, for example, will trigger the presumption only if the defendant shows the contact was somehow improper. Similarly, **even contact about the case may be insufficient to trigger the presumption if the surrounding circumstances show the contact was innocuous.**

-12-

1
2          Importantly, however, the defendant's burden at step one to show
3      a possibility of prejudice is not onerous. The defendant need only
       demonstrate a *credible* risk, and the presumption may arise even when
4      "[w]e do not know from th[e] record ... what actually transpired, or
       whether the incidents that may have occurred were harmful or harmless."
       *Remmer*, 347 U.S. at 229, 74 S.Ct. 450.

5      861 F.3d at 967-68 (bold emphasis added; italic emphasis in original).

6          The *en banc* court in *Godoy* cited with apparent approval the prior related discussion in

7      *Tarango v. McDaniel*, 837 F.3d 936, 947 (9th Cir. 2016), *cert. denied sub nom. Filson v. Tarango*, 137

8      S.Ct. 1816 (2017).  *Godoy* reviewed a California state appellate decision; *Tarango* arose instead out of

9      Nevada.  Significantly, the panel opinion in *Tarango* can be read as suggesting that the analysis applied

10     in *Meyer* is compatible with clearly established federal law as determined by the United States Supreme

11     Court in the context presented here.

12         In *Tarango*, the Ninth Circuit did not conclude that the state supreme court's decision was

13     contrary to clearly established federal law because the court applied the wrong general legal standard.

14     Rather the Ninth Circuit held that the state court incorrectly concluded that no presumption could arise

15     because a police officer allegedly tailing a known holdout juror in order to intimidate him was not a

16     "communication" about the case.  The Ninth Circuit held in particular that:

17
18         It was . . . error for the Nevada Supreme Court not to conduct a
       prejudice analysis merely because Juror No. 2's police tail did not
19     amount to a "communication . . . about a matter pending before the
       jury."

20     837 F.3d at 949.

21         When the *Tarango* court later repeated the conclusion that the state supreme court's failure to

22     consider whether the juror may have been prejudiced by the police tail "contravened clearly established

23     federal law," 837 F.3d at 950, the court appended the following footnote:

24
25         ***Meyer*, which the Nevada Supreme Court relied upon,
       appears to require the same of Nevada courts**.  Although *Meyer*
26     rejects "the position that any extrinsic influence is automatically
       prejudicial," it does not limit the occasions in which a court must
27     consider the possibility of prejudice.  *See* 80 P.3d at 455.  Rather,
       because prejudice is not presumed for less egregious contacts, "the
28     extrinsic information must be analyzed in the context of the trial as a
       whole to determine if there is a reasonable probability that the

                                           -13-

information affected the verdict." *Id.* at 455–56. *Meyer* does not, however, wholly foreclose a prejudice inquiry in the face of credible allegations of juror misconduct. *Id.*

837 F.3d at 950 n.13 (bold emphasis added).

Thereafter, in the passage from *Tarango* referenced in the previously-quoted portion of the *en banc Godoy* opinion that discussed more "prosaic" or "innocuous" contacts, the panel again suggested a substantial equivalence between the rule in *Meyer* and the federal law to be applied:

> Under our precedent, where an external contact with the jury is shown, a trial court should determine whether the contact "raises a risk of influencing the verdict." *Caliendo*, 365 F.3d at 697. Under such circumstances, prejudice is presumed and the government bears the burden of rebutting the presumption of prejudice. *Id.* To be sure, "certain chance contacts between witnesses and jury members—while passing in the hall or crowded together in an elevator—may be inevitable." *Id.* at 696 (internal quotation marks and citation omitted). Therefore, if the contact involves a "prosaic" or "more common and less pernicious extraneous influence" than jury tampering, the court should determine whether the jury was "substantially swayed" by the contact.[FN15] *United States v. Henley*, 238 F.3d 1111, 1115–16 (9th Cir. 2001). **Under this circumstance, the defendant bears the burden of offering sufficient evidence to trigger a presumption of prejudice**. *See Caliendo*, 365 F.3d at 696–97 (collecting authorities).
>
> > [FN15] **The Nevada Supreme Court has identified a similar dichotomy in its own construction of Supreme Court case law prohibiting external influences on criminal juries.** *Meyer*, **80 P.3d at 455–56.**

837 F.3d at 951 & n.15 (bold emphasis added).

Von Tobel focuses on the language from *Meyer* limiting a "conclusive" presumption of prejudice to "the most egregious cases of extraneous influence on a juror, such as juror tampering."[14] However, the burden placed upon the defendant in *Meyer* to trigger a presumption of prejudice – absent a more egregious case such as jury tampering, which did not occur here – specifically is a showing that "there is a reasonable probability or likelihood that the juror misconduct affected the verdict."[15]

Under established law, a "reasonable probability" is not a stringent standard requiring proof that something is more probable than not. *See, e.g., Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1243 (9th

---

[14]119 Nev. at 564, 80 P.3d at 455.

[15]*Id.*

-14-

Cir. 2005).  Rather, a reasonable probability is merely a probability sufficient to undermine confidence in the outcome.  *E.g., Johnson v. State*, 402 P.3d 1266, 1273 (Nev. 2017).

It is subject to question whether the threshold "reasonable probability" standard applied by the Supreme Court of Nevada to generate a presumption in this context necessarily is different in substance from the multiple varying statements of the threshold standard employed by the Ninth Circuit.  The Court of Appeals has stated variously, *inter alia*, that: (1) the "defendant need only demonstrate a *credible* risk" of influencing the verdict;[16] (2) "the defendant bears the burden of offering sufficient evidence to trigger a presumption of prejudice;"[17] (3) "the defendant must show that the communication could have influenced the verdict;"[18] and (4) a "communication is possibly prejudicial, not *de minimis*, if it raises a risk of influencing the verdict."[19]  Again, it is subject to question whether the state supreme court's "reasonable probability" expression of the threshold standard necessarily is markedly different from the various expressions of a threshold standard by the Ninth Circuit.  Nor does it appear that any such marked difference is established by specific Supreme Court discussion, as opposed to circuit level discussion, and further in the specific context of jury misconduct, that was on the books at the time of the state supreme court's decision on February 29, 2008.

Accordingly, in Von Tobel's case, the Supreme Court of Nevada, following its prior *Meyer* decision, applied an analysis under which: (1) in the most egregious cases of extraneous influence on a juror, such as jury tampering,[20] a *conclusive* presumption of prejudice applies; (2) the defendant otherwise must make a threshold showing that there was a reasonable probability that the juror misconduct affected the verdict in order to raise a presumption of prejudice, a threshold showing that

---

[16]*Godoy*, 861 F.3d at 968 (emphasis in original).  *See also id.*, at 967 (within discussion of *Tarango*).

[17]*Tarango*, 837 F.3d at 951.

[18]*Caliendo v. Warden of California Men's Colony*, 365 F.3d 691, 696 (9th Cir. 2004).

[19]*Id.*, at 697.

[20]*Cf. Tarango*, 837 F.3d at 531 (distinguishing between prosaic or common events and more "pernicious extraneous influence" such as jury tampering).  Any distinction between a more "pernicious extraneous influence" and an "egregious extraneous influence" would appear to be a rather fine one.

-15-

has not been established conclusively to markedly differ in substance from the multiple threshold standards articulated in Ninth Circuit precedent; and (3) under either alternative, the state supreme court's analysis makes no provision for the State to be able to rebut or overcome the presumption of prejudice once established. While *Meyer* reviewed a range of authorities and possible rules, including *Remmer*'s rebuttable presumption, the analysis that the Supreme Court of Nevada ultimately adopted after that review did not allow for any opportunity for the State to rebut any presumption of prejudice reached under its analysis, under either alternative.[21]

The rule applied by the Supreme Court of Nevada most definitely is different from the rule that the Ninth Circuit has held constitutes clearly established federal law as determined by the United States Supreme Court. The rule as stated in *Meyer* does not allow for the State being able to rebut a presumption of prejudice once established. The statement of the rule thus had no occasion to refer to any burden that must or can be carried by the State to overcome a presumption.

That difference does not necessarily make the rule applied by the Supreme Court of Nevada "contrary to" that clearly established federal law under AEDPA, however. As the United States Supreme Court explained in *Early v. Packer*, 537 U.S. 3 (2002):

> First, the Ninth Circuit observed that the state court "failed to cite ... any federal law, much less the controlling Supreme Court precedents." 291 F.3d, at 578. If this meant to suggest that such citation was required, it was in error. A state-court decision is "contrary to" our clearly established precedents if it "applies **a rule** that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Avoiding these pitfalls does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them. The Ninth Circuit's disapproval of the Court of Appeal's failure to cite this Court's cases is especially puzzling **since the state court cited instead decisions from the California Supreme Court that impose even *greater* restrictions for the avoidance of potentially coercive jury instructions**. Compare *People v. Gainer, supra*, at 852, 139 Cal.Rptr. 861, 566 P.2d, at 1006 (1977) with *Allen v. United States, supra*, at 501, 17 S.Ct. 154.

537 U.S. at 8 (bold emphasis added; italic emphasis in original).

---

[21]*See* 119 Nev. at 564-65; 80 P.3d at 455.

1    Here, the state supreme court's *Meyer* analysis, on its face, at the very least in part provides even

2    greater protection from extraneous influences on jury verdicts than does the clearly established Supreme

3    Court precedent as outlined in the governing Ninth Circuit cases.  If an egregious extraneous influence,

4    such as jury tampering, is involved, what the Ninth Circuit similarly refers to as a more "pernicious

5    extraneous influence,"[22] then prejudice is "conclusively" presumed – without any stated opportunity for

6    the State to rebut the presumption as instead would be allowed under clearly established federal law.

7    If the defendant otherwise makes a threshold showing of a reasonable probability that the juror

8    misconduct affected the verdict, where the Ninth Circuit in comparison refers to "a *credible* risk of

9    influencing the verdict," then prejudice is presumed, once again without any stated opportunity for the

10    State to rebut the presumption as instead would be allowed under clearly established federal law.

11        Further to the point, there is no discussion *in Supreme Court precedent* that refers to contact that

12    involves "prosaic kinds of jury misconduct,"[23] that delineates what contacts specifically fall within that

13    lesser category, and further that, importantly, defines the threshold standard that a defendant must

14    satisfy to trigger a presumption of prejudice in *that* context.

15        The Ninth Circuit's discussion – including in *Godoy*, in *Tarango* and in *Caliendo* – of the more

16    "prosaic" forms of juror misconduct, of the situations that fall within that category, and, again

17    importantly, of the defendant's threshold burden in that context, instead trace back to discussion in

18    *circuit* precedent, not Supreme Court precedent.  *See, e.g., United States v. Dutkel*, 192 F.3d 893, 895-

19    96 (9th Cir. 1999)(extended discussion of prior circuit level precedent concerning prosaic contact).[24]

20        At the time of the state supreme court's February 29, 2008, decision on the merits, no apposite

21    holding of the United States Supreme Court precluded the Supreme Court of Nevada from concluding

---

[22]See note 19, *supra*.

[23]*Godoy*, 861 F.3d at 967.

[24]The *Godoy en banc* opinion disapproved – during *de novo* review in 2017 – of *Dutke*'s conclusion in *dicta* that the *Remmer* presumption applied only in cases of jury tampering.  861 F.3d at 968 n.6.  *Godoy* carried forward, however, the prosaic/non-prosaic distinction notwithstanding the *en banc* court's disagreement with the 1999 panel opinion as to what specifically fell on one side or the other of that line.  The salient point is that one has to delve, deeply, into *circuit* precedent rather than Supreme Court precedent to determine the contours of both the prosaic/non-prosaic distinction itself and the threshold burden that the defendant must bear as to contacts deemed to be "prosaic."  Those specific contours are established, if at all, only by circuit precedent, not by Supreme Court precedent.

that the juror's neighbor's general comment fell on the "prosaic" – or non-"egregious" in *Meyer*'s terminology or "innocuous" in *Godoy*'s alternate terminology – side of the "prosaic/non-prosaic" line referenced in the Ninth Circuit's precedents.

At the time of the state supreme court's February 29, 2008, decision on the merits, no holding of the United States Supreme Court precluded the Supreme Court of Nevada from requiring a defendant to satisfy a "reasonable probability" materiality standard to generate a presumption of prejudice for such a prosaic, non-egregious or innocuous juror contact.

Accordingly, regardless of whether or not the state supreme court's analysis in Von Tobel's case on February 29, 2008, is fully consonant with statements nearly a decade later in Ninth Circuit case law regarding the Circuit's prosaic/non-prosaic distinction, petitioner has not established that – in this context – the state court's analysis was contrary to clearly established federal law "as determined by the Supreme Court of the United States" under 28 U.S.C. § 2254(d)(1). This conclusion follows particularly given the expressions in the Ninth Circuit's *Tarango* decision potentially suggesting a substantial equivalence between the federal law rule and the rule applied in the state supreme court's *Meyer* opinion that was followed in Von Tobel's case.

Moreover, given the paucity of Supreme Court precedent specifically addressing the Circuit's prosaic/non-prosaic distinction and the threshold showing required to generate a presumption, petitioner has not established that the state supreme court's decision was an objectively unreasonable application of the high court's precedents. A passing comment by a neighbor, even a purportedly "undercover cop" neighbor, to a juror that defendants would not be in court if they had not done something is not necessarily equivalent to prior circumstances where existing Supreme Court precedent would apply a presumption of prejudice. Such a passing comment is not necessarily equivalent to a bailiff telling the jurors that "This is the third fellow he has killed" and the jurors further being exposed to a newspaper account, *inter alia,* similarly noting the defendant's prior prosecutions and essentially expressing surprise that the jury had not returned the expected guilty verdict within an hour.[25] Such a passing

---

[25]*Mattox*, 146 U.S. at 142-44 (statement of the facts by the Chief Justice). In point of fact, the *Mattox* Court would have held only that the trial court erred by not considering affidavits offered to show the extraneous influence on

(continued...)

comment also is not necessarily equivalent to a juror being subjected to an *ex parte* interview by the Federal Bureau of Investigation during trial investigating an alleged jury tampering incident that, along with the original incident, left the juror "a disturbed and troubled man. . . until after the trial."[26]

The state supreme court's determination that a presumption of prejudice did not arise in the first instance in the more innocuous circumstance presented in this case was not an objectively unreasonable application of the prior Supreme Court precedent from 1892 and the mid-1950's.

The state supreme court's further reliance upon, *inter alia*, the trial court's instructions on the presumption of innocence in finding that the innocuous circumstance presented did not give rise to a presumption of prejudice further was not an objectively unreasonable application of prior Supreme Court precedent. *See, e.g., Godoy*, 861 F.3d at 967 (quoting *Caliendo*, 365 F.3d at 697-98)("Other factors [in assessing possible prejudice] may include the length . . . of the contact, . . . evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction.").[27]

Petitioner accordingly has not demonstrated that – in the context presented – the state supreme court's rejection of this claim on the merits was either contrary to or an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court.

_____

[25](...continued)
the jury. The Court did not have occasion to remand for further consideration along these lines, however, because it held that reversal instead for a new trial was required on another, entirely different issue. *See* 140 U.S. at 151.

[26]*Remmer II*, 350 U.S. at 380-82.

The neighbor's comment by the community mailboxes in this case further is not necessarily equivalent to the circumstances in which the Ninth Circuit previously has applied a presumption of prejudice. Such a comment, even by a purported police officer neighbor, is not necessarily equivalent to a juror communicating to the rest of the jury what her "judge friend" had texted her about the ongoing case continually throughout the case (*Godoy*), a police cruiser tailgating a known holdout juror on the way to the courthouse allegedly to intimidate him, with that allegedly desired effect being achieved (*Tarango*), or an officer who was a key witness for the State having an extended conversation with jurors (*Caliendo*).

[27]Potential jurors are hardly insulated from opinions by a multitude of casual contacts over the course of their lives opining, *e.g.*, that defendants would not be charged if they were not guilty, that only guilty people do not testify, that only guilty people need to be concerned about warrantless police searches because innocent people have nothing to hide, etc., etc. If exposure to such opinions at the dinner table, at the coffee shop on the way to work, at the proverbial water cooler, and at the neighborhood mailboxes rendered jurors incapable of following court instructions on, *inter alia*, the presumption of innocence, courts would have considerable difficulty in being able to seat a jury and/or reaching a reliable verdict in criminal cases.

1    Ground 1 therefore does not provide a basis for federal habeas relief.[28]

2    Reasonable jurists could find the issue a debatable one, however, and the Court accordingly will

3    grant a certificate of appealability on this ground.

4    ***Ground 4: Prosecutorial Misconduct – Minimization of the State's Burden of Proof***

5    In the next remaining ground, Ground 4, petitioner alleges that he was denied rights to due

6    process, to a fair trial, and to a trial before an impartial jury in violation of the Sixth and Fourteenth

7    Amendments because the prosecutor improperly minimized the State's burden of proof beyond a

8    reasonable doubt during her closing argument.

9    The claim is grounded in the following sequence during the State's rebuttal argument:

10   MS. GOETTSCH: . . . . Another thing to consider is reasonable doubt. I encourage you, ladies and gentlemen, to back [sic] into the jury

11   room and look at what reasonable doubt is. It's not any doubt. It has to be reasonable doubt. If you know that he did this, then he's guilty. It's

12   not a mysterious standard.

13   MR. SILVERSTEIN: Your Honor, I'm going to object. That is one of the most unbelievable misstatements of the reasonable doubt

14   standard I've ever heard. If you know he's guilty, he's guilty? That is not the standard in this courtroom.

15

16   _____

17   [28]This Court is bound by the holding in, *inter alia*, *Godoy* as to the constitutional underpinnings of the rule derived from *Mattox* and *Remmer*. The Court notes in passing, however, that both the Supreme Court's 1892 decision in

18   *Mattox* and its mid-1950's decisions in *Remmer* arose from federal criminal cases. While the decisions reference the right to trial by jury, the decisions nonetheless had no occasion – particularly at those periods of time – to potentially

19   distinguish between standards applicable to a federal district court's exercise of discretion in considering a motion for a new trial in a federal criminal case from constitutionally-mandated presumptions applicable to the States through the

20   Fourteenth Amendment. The *Mattox* Court in particular surveyed precedents from various state supreme courts and a criminal law treatise rather than necessarily grounding its discussion in constitutional doctrine. *See* 146 U.S. at 149-51.

21   Should this issue reach the Supreme Court in a case arising instead from a state court conviction, an initial question perhaps might be the extent to which Supreme Court precedent clearly establishes that the Constitution compels the

22   specifics of the burden-shifting analysis derived from *Mattox* and *Remmer* upon the States in sundry varying contexts.

23   In this same vein, the burden-shifting framework applied in *Meyer* was culled by the Supreme Court of Nevada

24   not from necessarily constitutionally-compelled presumptions but instead from a comparative review of, *inter alia*, the various rules applied by the courts of other states and by federal appellate courts establishing standards applicable in

25   federal criminal cases. *See* 119 Nev. at 563-66, 80 P.3d at 455-56.

26   In the final analysis, the burden-shifting analysis applied by the Supreme Court of Nevada in *Meyer* perhaps

27   may be within a permissible range of standards set by a state supreme court in determining the ambit of discretion of a state trial court when facing a motion for new trial based upon *de minimis* juror misconduct, such as, for example, a

28   juror engaging in ill-advised small talk during a case at community mailboxes with a neighbor who, openly, claims to be an "undercover" police officer.

THE COURT: The reasonable doubt – the objection is noted and sustained. The reasonable doubt instruction is contained within your jury instructions, and I will remind you that that which is said by any of our attorneys in closing arguments is not evidence. Ms. Goettsch may continue.

MS. GOETTSCH: It has – there's nothing that – there's nothing mysterious about the reasonable doubt standard. If you believe these kids, and you do not have any doubt that's reasonable, then you must return a verdict of guilty. The defense attorney talked a lot about the State wanting to win a case, and that the State wins a case based on sympathy. The kids are not asking for sympathy. I'm not asking for sympathy. I'm asking that I win, if you want to say it that way, based on an abiding conviction of the Defendant's guilt. That's what reasonable doubt is. Read that. It's not mysterious. It's not anything higher than what it reads in that jury instruction.

And lastly and tied to the reasonable doubt standard is: Well, I believe the kids. I believe what they're saying is true, but the evidence is not enough, not accurate, not following the law. There is a jury instruction that tells you that if you believe the testimony of a victim of sexual assault or lewdness, i.e., the kids in this case, if you believe them beyond a reasonable doubt, that is enough to sustain a verdict of guilty.

So it can't be a verdict of not guilty based on: Well, I believe the kids. I think they're telling the truth, but I wanted something more. That's against the law. You need to follow the law, but I wanted something more. That's against the law. You need to follow the law, and if you believe those kids beyond a reasonable doubt, regardless of whether or not there's DNA or anything else –

MR. SILVERSTEIN; Your Honor, Your Honor, again I'm going to object. This – that is a misstatement of the law, Your Honor.

THE COURT: Ms. Goettsch, I'm going to ask you to, again, contain. I'm going to overrule that objection, however, and ask you to contain your comments to the standard that is set forth in the instructions.

MS. GOETTSCH: That is enough to sustain a verdict of guilty, if you believe these kids beyond a reasonable doubt, and that alone. No other evidence is required. But fortunately in this case, you have corroboration. You have more than just the kid's testimony. [Counsel in following paragraphs discusses the State's additional evidence.]

(ECF No. 25-11, at 88-89; Exhibit 31, at 85-86.)

The state supreme court rejected the claim presented to that court on the following basis:

<u>Prosecutorial comment on the reasonable doubt standard and other alleged misconduct</u>

Von Tobel argues that the State engaged in prosecutorial misconduct when it commented on the reasonable doubt standard, and

-21-

when it asked the jury to "do its job" and convict Von Tobel [discussed *infra* regarding federal Ground 5]. We have consistently held that it is improper for either party to comment on or attempt to characterize reasonable doubt beyond using the express language in NRS 175.211, but that any such error is harmless when the court properly instructs the jury regarding the statutory definition of reasonable doubt.[FN18] Additionally, we have stated that when an attorney improperly characterizes reasonable doubt, the district court should issue an immediate curative instruction to the jury.[FN19]

[FN18] <u>Randolph v. State</u>, 117 Nev. 970, 980-81, 36 P.3d 424, 431 (2001).

[FN19] <u>Id.</u> at 981, 36 P.3d at 431-32.

In this case, the district court not only properly instructed the jury concerning the reasonable doubt standard, but the district court also admonished the jury immediately following the improper remarks that the law concerning reasonable doubt was contained within the jury instructions and that attorneys' statements are not evidence. Accordingly, we conclude that any inappropriate representation of the reasonable doubt standard by the State constituted harmless error because the jury was correctly instructed on the definition of reasonable doubt and was immediately admonished to follow that instruction.

(ECF No. 25-15, at 8-9; Exhibit 55, at 7-8.)

On federal habeas review, it is critical to distinguish state and federal criminal law standards for prosecutorial conduct from the federal constitutional standard. On federal habeas review of a state court conviction for constitutional error, the standard of review for a claim of prosecutorial misconduct, is "'the narrow one of due process, and not the broad exercise of supervisory power'" applied in federal criminal trials. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). Nor do alleged violations of state law standards for prosecutorial conduct present cognizable federal claims. Rather, under the narrower due process standard, "[t]he relevant question is whether the [alleged misconduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden, supra* (quoting *Donnelly*, 416 U.S. at 643). *Accord Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).

Petitioner proceeds on the premise that the Supreme Court of Nevada held that the State's argument constituted a due process violation under *Donnelly* and then applied a federal harmless error standard. Proceeding from this premise, petitioner maintains that such a due process violation was not harmless under the standard in *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

1    Petitioner's reading of the state supreme court's decision is not the most plausible one.  On this

2    particular claim, the state supreme court relied upon a single prior state court decision.  That decision,

3    and the cases relied upon therein on this issue, clearly exercised the state supreme court's supervisory

4    authority over state criminal trials.[29]   None of the cases explicitly applied the federal due process

5    standards in *Darden* and *Donnelly* to find the presence of error on such a claim.  Nor did the state

6    supreme court reference any such federal due process standard under *Darden* and *Donnelly* – in

7    addressing this particular claim – in Von Tobel's case.  Indeed, it arguably would be inconsistent to hold

8    implicitly that prosecutorial misconduct "so infected the trial with unfairness as to make the resulting

9    conviction a denial of due process" while at the same time concluding that the error was harmless under

10   a federal harmless error standard.  The most plausible reading of the state supreme court's order is that

11   the court concluded that the prosecutor's reasonable-doubt arguments gave rise to state law error that

12   in turn was harmless under state law standards, implicitly rejecting any claim that the argument gave

13   rise to a federal due process violation.  *Cf. Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir. 2014)(state

14   supreme court's determination that prosecutor's improper reasonable doubt argument constituted

15   harmless error constituted implied ruling that no due process violation occurred under *Darden*).

16       The state supreme court's implicit ruling that no due process violation occurred was neither

17   contrary to nor an objectively unreasonable application of the clearly established federal law in *Darden*

18   and *Donnelly*.  Petitioner has not established in the first instance that the state supreme court's rejection

19   of the claim was contrary to these Supreme Court precedents.  In assessing further whether a state

20   court's express or implicit rejection of a claim under a general due process standard such as this was

21   objectively unreasonable:

22           . . . . The meaning of "unreasonable" can depend in part on the
             specificity of the relevant legal rule.  If a rule is specific, the range of
23           reasonable judgment may be narrow.  Applications of the rule may be
             plainly correct or incorrect.  Other rules are more general, and their

24

25       [29]*See Randolph v. State*, 117 Nev. 970, 979-82, 36 P.3d 424, 430-32 (2001), and cases cited therein.  In
26   *Randolph*, the Supreme Court of Nevada noted its prior admonitions to prosecutors within the state that they would
     "venture into calamitous waters" if they sought to supplement the statutorily-required reasonable doubt instruction in
27   argument.  While the court held that the error was harmless because the proper jury instruction had been given, the court
     directed the prosecutor in question to show cause why a sanction of either a monetary fine or referral to the state bar
28   association for disciplinary proceedings should not be ordered.  117 Nev. at 983 n.16; 36 P.3d at 432 n.16.

| | |
|---|---|
| 1 | meaning must emerge in application over time. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations. |
| 2 | |

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

Petitioner presents only argument without accompanying supporting citation over and above the general principles drawn from *Darden*, *Donnelly*, and the holding regarding reasonable doubt from *In re Winship*, 397 U.S. 358 (1970). It was not objectively unreasonable for the state supreme court to implicitly conclude that the prosecutor's remarks regarding reasonable doubt did not so infect Von Tobel's trial with unfairness as to make his conviction a violation of due process. Petitioner does not contest the fact that the jury instructions properly charged the jury with the correct statement of the reasonable-doubt standard.[30] When the defense objected to the first challenged remark, the trial court sustained the objection and referred the jury to the jury instructions for the correct statement of the reasonable-doubt standard. When the defense objected to the second remark, the court admonished the prosecutor to contain her comments to the standard in the instructions. The prosecutor thereafter rephrased and clarified her argument to make the point that a conviction could be based upon the testimony of the victims alone, if believed beyond a reasonable doubt, which is what the jury instructions in fact state.[31] Petitioner's contention that the prosecutor thereby instead "implored the jury to apply the reasonably [sic] doubt standard to only a portion of the evidence, but not the case in its entirety,"[32] is, at best, unpersuasive. Petitioner further urges that the only appropriate action by the state trial court would have been to declare a mistrial *sua sponte* despite the absence of any defense request for a mistrial. However, the state supreme court's conclusion that no such action was required on the record presented, including the underlying trial evidence, was not an objectively unreasonable application of the general due process standard in Supreme Court precedent.

Ground 4 therefore does not provide a basis for federal habeas relief.

---

[30]See ECF No. 25-16, at 12; Exhibit 36, Instruction No. 5.

[31]Jury Instruction No. 21 states: "There is no requirement that the testimony of a victim of a sexual assault and/or lewdness with a minor be corroborated, and his or her testimony standing alone, if believed beyond a reasonable doubt, is sufficient to sustain a verdict of guilty." (ECF No. 25-16, at 28; Exhibit 36.)

[32]ECF No. 69, at 21.

***Ground 5: Prosecutorial Misconduct – Asking Jurors to "Do Your Job"***

In Ground 5, petitioner alleges that he was denied rights to due process, to a fair trial, and to a trial before an impartial jury in violation of the Sixth and Fourteenth Amendments when the prosecutor asked jurors during the State's closing argument to "do your job" and find petitioner guilty.

This claim is grounded in the following sequence at the conclusion of the State's closing argument:

> MS. HOLTHUS: . . . . And that is it. So, at the conclusion, well, the kids have done their job, and we're going to ask you to do your job and find him guilty of all but the two counts. Thank you.
>
> MR. SILVERSTEIN: Your Honor, I'm going to object to any statement that the jury needs to do his [sic] job to convict. The jury's job is to be fair in this case, not to convict. And I would ask that be [sic] stricken.
>
> THE COURT: I would agree, and direct the jury to be mindful of the instructions that were given as to what their duty is. Thank you, Ms. Holthus.

(ECF No. 25-122, at 50; Exhibit 31, at 47.)

The state supreme court rejected the claim presented to that court on direct appeal on the following grounds:

> We next consider Von Tobel's allegation that the prosecutor committed misconduct by exhorting the jury to "do its job." In Evans v. State, this court recognized that attorneys may not imply to a jury that it has a duty to decide the case a certain way.[FN20] However, prosecutorial misconduct only warrants reversal if the remarks so influenced the proceeding that it deprived the defendant of a fair trial.[FN21] The statements should be considered in context, and "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."[FN22]
>
> [FN20] 117 Nev. 609, 633-34, 28 P.3d 498, 515 (2001).
>
> [FN21] Anderson v. State, 121 Nev. 511, 516, 118 P.3d 184, 187 (2005).
>
> [FN22] United States v. Young, 470 U.S. 1, 11 (1985).
>
> We conclude that although the prosecutor's exhortation of the jury to "do [its] job and find [Von Tobel] guilty" was improper, it did not so infect the trial with unfairness as to deny Von Tobel due process –

1           particularly because Von Tobel's objection to the State's argument was
2   sustained and the jury was immediately admonished that it should refer
    to the jury instruction regarding their duty in the case. Therefore,
    considering the comment in context, we conclude that the State's
3   comment does not warrant reversal.

4   (ECF No. 26-15, at 9-10; Exhibit 55, at 8-9.)

5        The state supreme court's rejection of this claim was neither contrary to nor an objectively

6   unreasonable application of the clearly established law in *Darden* and *Donnelly* discussed previously

7   regarding Ground 4. Given in particular that the trial court sustained the defense objection and directed

8   the jurors to the jury instructions with regard to their duties in the case, it was not objectively

9   unreasonable for the state supreme court to conclude that the improper remark did not so infect the trial

10  with unfairness as to deny Von Tobel due process. Petitioner's reliance on arguments, *inter alia*, that

11  prejudice from the remark could not be removed by a simple instruction and that the jury's ability to

12  exercise independent judgment would be overwhelmed by the prestige and status of the prosecutor is

13  unpersuasive, particularly on deferential review under AEDPA of the state supreme court's application

14  of a general due process standard.

15       Ground 5 therefore does not provide a basis for federal habeas relief.

16  ***Ground 7: Void for Vagueness***

17       In the last remaining ground, Ground 7, petitioner alleges that his conviction for open and gross

18  lewdness under N.R.S. 201.210 violated his rights to due process of law and a fair trial under the

19  Fourteenth Amendment because the statute is void for vagueness.

20       The information charged Von Tobel in Count 12 with open or gross lewdness in violation of

21  N.R.S. 201.210 in that he allegedly "did then and there wilfully and unlawfully commit an act of open

22  or gross lewdness by defendant masturbating in the presence of" the victim, who was alleged vis-à-vis

23  other charges to be under the age of 14.[33] She testified, using different terminology, that "at least once"

24  Von Tobel pulled down his shorts in front of her and masturbated until he ejaculated.[34]

25      */ / / /*

26  _____

27  [33]ECF No. 24-10, at 2 & 5; Exhibit 9, at 1 & 4.

28  [34]ECF No. 25-4, at 107; Exhibit 24, at 104.

The Supreme Court of Nevada rejected the claim presented to that court on direct appeal on the following grounds:

Vagueness of NRS 201.210

Von Tobel argues that NRS 201.210 is unconstitutional on its face because it fails to define "open or gross lewdness." We review a challenge to the constitutionality of a statute de novo.[FN27] Because we presume that statutes are constitutional, a party challenging the statute must prove that the statute is unconstitutional.[FN28] In City of Las Vegas v. District Court, this court held that a statute is facially unconstitutional as void for vagueness "if the statute both: (1) fails to provide notice sufficient to enable ordinary people to understand what conduct is prohibited; and (2) authorizes or encourages arbitrary and discriminatory enforcement."[FN29]

[FN27] Silvar v. Dist. Ct., 122 Nev. 289, 292, 129 P.3d 682, 684 (2006).

[FN28] Id.

[FN29] 118 Nev. 859, 862, 59 P.3d 477, 480 (2002) (citing City of Chicago v. Morales, 527 U.S. 41, 55-56 (1999) (plurality opinion) (holding that a statute may be unconstitutionally vague for either of the two reasons discussed above)). The City of Las Vegas court specifically noted conflicting lines of Nevada case law regarding facial challenges to statutes, and specifically modified any prior case law limiting facial challenges to statutes affecting conduct protected under the First Amendment. Id. at 862-63, 59 P.3d at 480. Therefore, we reject the State's argument that NRS 201.210 was constitutionally definite as applied to Von Tobel's conduct and consider Von Tobel's facial challenge of the statute. See Morales, 527 U.S. at 72 (Breyer, J., concurring) (describing the rule prohibiting a defendant from challenging a statute for vagueness if it gave him notice that his conduct was prohibited, but rejecting application of that rule because the statute was unconstitutionally vague for failing to provide adequate enforcement standards and therefore, allowing a facial challenge to the statute despite the defendant's conduct).

NRS 201.210(1) provides: "A person who commits any act of open or gross lewdness is guilty: (a) For the first offense, of a gross misdemeanor. (b) For any subsequent offense, of a category D felony and shall be punished as provided in NRS 193.130." When considering a statute's constitutional definiteness, we look not only to the express language of the statute but also to how this court has defined the conduct prohibited by the statute.[FN30] This court has considered the conduct prohibited by NRS 201.210 in several cases, most notably Young v. State[FN31] and Ranson v. State.[FN32]

-27-

[FN30] See U.S. v. Lanier, 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed.").

[FN31] 109 Nev. 205, 849 P.2d 336 (1993).

[FN32] 99 Nev. 766, 670 P.2d 574 (1983).

In Young, this court stated the common-law definition of "open lewdness" as "'unlawful indulgence of lust involving gross indecency with respect to sexual conduct' committed in a public place and observed by persons lawfully present."[FN33] The Young court held that although the common-law definition of "open lewdness" required conduct to be observed, NRS 201.210 had no such requirement.[FN34] This court further held that the sexual conduct had to be intentionally public and therefore, affirmed the convictions of several consenting adult men who engaged in sexual conduct in a public restroom.[FN35] In Ranson, this court further explored the definition of "open lewdness" by stating that it did not require the activity to be in a public place but only that such acts be committed in "an 'open' as opposed to a 'secret' manner" and that the perpetrator "intend[ed] that his acts be offensive to his victim."[FN36]

[FN33] 109 Nev. at 215, 849 P.2d at 343 (quoting 3 Wharton's Criminal Law § 315 (14th ed. 1980)).

[FN34] Id.

[FN35] Id.

[FN36] 99 Nev. at 767, 670 P.2d at 575.

(ECF No. 26-15, at 11-13; Exhibit 55, at 10-12.)

As petitioner notes, the undersigned previously has held that the state supreme court's rejection of a similar challenge to N.R.S. 201.210 as void for vagueness was neither contrary to nor an unreasonable application of clearly established federal law. *See Kenneth Friedman v. Jack Palmer*, No. 3:07-cv-00338-LRH-VPC, ECF No. 326, at 14-16, 2013 WL 4501027, at *10-*12 (D. Nev., Aug. 21, 2013). The Court of Appeals denied a certificate of appealability in *Friedman*. *Id.*, ECF No. 341.

Von Tobel's showing on the current petition does not lead the Court to a different conclusion. The Court accordingly holds that petitioner has not demonstrated that the state court's rejection of this claim was contrary to or an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court, for the reasons previously assigned in *Friedman*.

Ground 7 therefore does not provide a basis for federal habeas relief.

The Court nonetheless writes further regarding Ground 7 because respondents seek sanctions in the answer under, *inter alia*, Rule 11 of the Federal Rules of Civil Procedure. Respondents maintain that petitioner's counsel violated Rule 11 because the first amended petition alleges that the statute is void for vagueness without mentioning that subsequent state judicial opinions had further clarified the language of the statute. While the assistant federal public defender who drafted the pleading no longer is with the office, respondents urge that the office was obligated thereafter to excise the faulty claim after it was reassigned to a new attorney.

The Court is not sanguine that – even allowing for the factual specificity required in habeas pleading – petitioner was required to specifically include legal conclusion allegations referencing later judicial glosses on the statute in a pleading alleging that the statute was void for vagueness. In the reply, petitioner does specifically discuss the later judicial glosses, which also were discussed in the state supreme court decision being challenged in this case. With due respect to respondents' counsel, one must strain, mightily, to perceive any possible ethical violation and/or failure in a duty of candor to the tribunal in petitioner's filings on this claim, including in the first amended petition.

Moreover, Rule 11(c)(2) requires that any motion for sanctions thereunder (a) must be made separately from any other motion, and (b) must be filed only after first giving the other party an opportunity to correct the alleged violation within 21 days of service of the *unfiled* motion on the party. Respondents complied with neither requirement.

Respondents' request for sanctions neither is presented properly procedurally nor does it demonstrate any improper filing by petitioner herein. The Court trusts that in the future respondents' counsel will not present a similarly improper sanctions request again.

IT THEREFORE IS ORDERED that the petition is DENIED on the merits and that this action shall be DISMISSED with prejudice.

IT FURTHER IS ORDERED that a certificate of appealability (a) is GRANTED as to the denial of Ground 1 on the merits, and (b) is DENIED as to the denial of Grounds 4, 5 and 7 on the merits and Grounds 2, 3 and 6 as procedurally defaulted, as reasonable jurists would not find the district court's rejection of these latter grounds to be debatable or incorrect, for the reasons discussed herein and in the Court's prior order (ECF No. 61) on the procedurally defaulted claims.

IT FURTHER IS ORDERED that petitioner's motion (ECF No. 70) for leave to file supplemental authority is GRANTED and that the Clerk shall file the accompanying notice with the two accompanying decisions as attachments to the notice.

The Clerk shall enter final judgment accordingly in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED this 1st day of May, 2018.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE